IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Mary Compos,  Case No. 3:08 CV 1666

              Plaintiff,  MEMORANDUM OPINION
AND ORDER

-vs-

                                      JUDGE JACK ZOUHARY

Belen Cuellar, et al.,

              Defendants.

### BACKGROUND

Belen Cuellar was married to Fransisco Cuellar from 1965 until March 13, 1992, when the Paulding County Common Pleas Court granted the couple a Judgment of Divorce. Fransisco was then an hourly employee of General Motors Corporation (GM). He retired in 1993. As an hourly employee of GM, Fransisco was a participant in the GM Pension Plan, a plan governed by the Employee Retirement Income Security Act of 1974, as amended, ERISA, 29 U.S.C. § 1001 et seq. The Judgment of Divorce provided that Belen was to receive a portion of Fransisco's pension benefits.

This Judgment however did not explicitly provide for survivorship benefits. In order to assign benefits, ERISA requires there be a qualified domestic relations order (QDRO) spelling out the nature of the assignment of benefits. ERISA § 206(d)(1), 29 U.S.C. § 1056(d)(1). The relevant domestic relations order (DRO), filed in Paulding County Common Pleas Court on April 28, 1994, and revised on November 10, 1994 after the Judgment of Divorce, was approved and determined to be qualified by the GM Plan Administrator (Doc. No. 6, Exhibits B & C).

After his divorce from Belen, Fransisco married Johnlon Fegan on December 31, 1992. Johnlon is not a party to this case. Fransisco retired under the GM Pension Plan effective April 1, 1993. At the time of his retirement, Johnlon was not eligible to receive surviving spouse benefit coverage because she had not been married to Fransisco for at least one year. However, when Fransisco signed his retirement forms on March 17, 1993, he also made an election to designate Johnlon to receive surviving spouse benefits, which would become effective after one year of marriage (Doc. No. 6, Exhibit F). Beginning January 1, 1994, the surviving spouse option in favor of Johnlon went into effect, and Fransisco's monthly pension benefit was adjusted accordingly (Doc. No. 6, Exhibit G).

Fransisco died on December 13, 2007. At the time of his death, Belen no longer received pension benefits, while Johnlon received Fransisco's survivorship annuity. Belen disputes the cessation of benefits and also argues that she is entitled to the survivorship benefits.

**ANALYSIS**

Belen Cuellar brought her case to the Paulding County Common Pleas Court (Case No. CI-91-172), filing a motion to create, conform, and maintain the amended QDRO. She then filed a motion to add the General Motors Pension Administration Center as a party. Belen claims GM violated the QDRO by refusing to pay her benefits after the death of Fransisco. The case was removed to this Court by GM[1] (Doc. No. 5).

---

[1] While it might be true that Belen Cuellar ought to have gone through the proper administrative channels of appeal before bringing this dispute to court, the unique manner in which this dispute has come to this Court advises against dismissing this action for failure to exhaust administrative remedies. Belen did not, at least explicitly, initially seek to bring an ERISA denial of benefits claim, but rather brought a state court claim. In the interest of equity, as well as saving the parties from having to address this same controversy some time down the road, this Court will address the merits of Belen's claim here.

This Court previously addressed the issue of jurisdiction when the removal of this case from Paulding County Common Pleas Court was contested (Doc. No. 5). This Court has subject matter jurisdiction to the extent Belen Cuellar seeks ERISA benefits under the GM Pension Plan and has concurrent jurisdiction with the state court on other issues involving qualified domestic relations orders, such as their modification, and the removal to this Court was therefore proper (*See* Doc. No. 5).

In a case involving the Plan Administrator's interpretation and application of a QDRO, there is a two-step standard of review. The first step is to review, *de novo*, the language and terms of the QDRO to determine its scope. In light of the scope of the QDRO, the second step is to review the Administrator's denial of benefits under the arbitrary and capricious standard. *See Guzy v. Ameritech Corp*, 50 F. Supp. 2d 706, 711 (E.D. Mich. 1999).

A QDRO is a domestic relations order "which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." ERISA § 206(d)(3)(B)(i), 29 U.S.C. § 1056(d)(3)(B)(i). A domestic relations order is "any judgment, decree, or order (including approval of a property settlement agreement) which -- relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and is made pursuant to a State domestic relations law (including a community property law)." ERISA § 206(d)(3)(B)(ii), 29 U.S.C. § 1056(d)(3)(B)(ii).

The DRO at issue (Doc. No. 6, Exhibit B) is clearly qualified. It is a "judgment, decree, or order which relates to the provision of . . . alimony payments or marital property rights to a . . . former spouse . . . made pursuant to a State domestic relations law," and is therefore a "domestic relations

3

order." ERISA § 206(d)(3)(B)(ii); 29 U.S.C. § 1056(d)(3)(B)(ii). The DRO creates a right in the alternate payee (Belen Cuellar) to receive a portion of the benefits payable to a participant (her ex-husband Fransisco) under the plan, and is therefore a QDRO. ERISA § 206(d)(3)(B)(i); 29 U.S.C. § 1056(d)(3)(B)(I).

Belen argues that the DRO was not properly qualified because it did not meet the provision requiring a QDRO to "clearly specify . . . the number of payments or period to which such order applies." ERISA § 206(d)(3)(C)(iii); 29 U.S.C. § 1056(d)(3)(C)(iii) (Doc. Nos. 7 & 9). Nonetheless, Belen refers to the order either as a "qualified domestic relations order" or as a "QDRO" in her submissions. Why she would wish to argue that the DRO is not qualified is unclear. Were it not qualified, the DRO would not be exempted from ERISA's general preemption of state law,[2] as well as from ERISA's general anti-assignment provisions,[3] thus defeating Belen's argument for **any benefits at all**, including those already received under the plan. Such a result would also prevent any argument of estoppel, because state common law doctrines would be pre-empted by ERISA.

Luckily for Belen, this Court does not agree with her argument that the DRO is not qualified. Courts avoid using "unduly narrow interpretations of the language within a DRO" for the purpose of determining whether it is qualified or not. *Hawkins v. Commissioner*, 86 F.3d 982, 989-90 (10th Cir. 1996). It would be "asking too much of domestic relations lawyers and judges to expect them to dot every *i* and cross every *t* in formulating divorce decrees that have ERISA implications." *Metro. Life Ins. Co. v. Wheaton*, 42 F.3d 1080, 1085 (7th Cir. 1994).

---

[2] ERISA § 514(b), 29 U.S.C. § 1144(b).

[3] ERISA § 206(d)(1), 29 U.S.C. § 1056(d)(1).

4

Belen next argues that because the DRO does not specify what is to happen if her ex-husband predeceases her after commencement of retirement benefits, it fails to clearly specify a number of payments or period for payments as required by ERISA. This begs the ultimate question: whether the QDRO provides for survivorship benefits. The silence on this question can only mean that there were no survivorship benefits envisioned. There is a definite period for the benefits, ending at Fransisco's death. The DRO is therefore qualified.

In reviewing the QDRO *de novo* to determine its scope, it is at worst ambiguous regarding survivorship benefits at Fransisco's death. By using a well-established maxim of construction, that ambiguity dissolves. The QDRO explicitly provides for some sort of benefits to Belen or her beneficiaries in the following situations: (1) if Fransisco were to die before the benefits commence; (2) if Fransisco were to become disabled or terminate his employment prior to retirement; (3) if Fransisco were to elect early retirement; (4) if the plan were to terminate before the benefits commence; and (5) if Belen were to predecease Fransisco prior to the commencement of benefits (Doc. No. 6, Exhibit B). The QDRO is silent regarding the circumstance of Fransisco predeceasing Belen after the commencement of benefits.[4] *Expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another) is a well established maxim of interpretation. *See, e.g., Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993) (using maxim to interpret Federal Rule of Civil Procedure 9(b)). Here, the silence regarding

---

[4] The clause in the QDRO referencing "surviving spouse" under I.R.C. § 417(D) merely relates to the tax treatment of the benefits should Fransisco have died prior to commencement of benefits, and neither explicitly nor impliedly grants any further rights to Belen than are otherwise provided for in the QDRO (Doc. No. 6, Exhibit B, ¶ 3).

this foreseeable[5] circumstance when read in conjunction with all the expressly listed circumstances, **each granting benefits**, can only lead to the conclusion that survivorship benefits were not envisioned for Belen.

Further evidence supports this conclusion. The state court judgment which ordered the preparation of the QDRO did not direct Belen's attorney at the time to include a survivorship benefit (Doc. No. 6, Exhibit A). Fransisco's election of the surviving spouse option for Johnlon prior to the filing of the Belen Cuellar DRO in Common Pleas Court is also evidence that the QDRO was not understood to grant Belen survivorship benefits (Doc. No. 6, Exhibits F & G). There is no evidence presented that shows Fransisco ever revoked, or intended to revoke, his election of Johnlon as surviving spouse.

Having concluded that it is reasonable to interpret the QDRO as not granting Belen survivorship benefits, it follows that the Plan Administrator did not act arbitrarily or capriciously.

Belen argues *ad nauseum* that there is an unexplained discrepancy in the 1992 base benefit amount as compared to the 1993 base benefit amount, and that this discrepancy is evidence of the Plan Administrator considering her to be a surviving spouse (Doc. Nos. 7 & 9). This argument is without merit. The 1992 base amount is very reasonably explained in footnote 1 in GM's response brief (Doc. No. 8). At the time of the QDRO in 1992, Fransisco was still employed by GM and his base amount had not fully accrued. Without necessarily addressing whether equitable estoppel would be available

---

[5] It is notable that Fransisco predeceasing Belen after the commencement of benefits is far more foreseeable than some of the expressly listed circumstances in the QDRO, for example, the termination of the plan prior to commencement of benefits. That a granting of survivorship benefits was omitted simply because it was assumed obvious or it was unforeseeable is belied by the nature of the circumstances that were listed and expressly granted benefits.

to Belen in this case, her estoppel argument, relying on the supposedly erroneous base amount, fails for the same reason as her argument on the merits regarding the base amount.

## CONCLUSION

GM's Motion to Affirm the Plan Administrator's Decision Denying Belen Cuellar Surviving Spouse Benefits (Doc. No. 6) is granted.

IT IS SO ORDERED.

                                              s/ *Jack Zouhary*
                                              JACK ZOUHARY
                                              U. S. DISTRICT JUDGE

                                              October 30, 2008